STATE OF NORTH CAROLINA v. YSUT MLO

No. 177A93

(Filed 28 January 1994)

1. **Evidence and Witnesses § 1278 (NCI4th)— murder—defendant's statement—knowing waiver of rights**

     The trial court did not err in a noncapital first-degree murder prosecution by determining that defendant waived his rights knowingly, intelligently and voluntarily where the evidence showed that defendant had only a third-grade education in Vietnam; there was no evidence that he had had any formal training in English or that he was required to speak it at his job; although an interpreter was provided who was fluent in both Vietnamese and English, the defendant's native language was Dega, the language of the Montagnard region of Vietnam; defendant had not been placed under arrest, nor had he been handcuffed, shackled, or restrained in any way when the statement was given; when the waiver of rights form was read to defendant both in English and in Vietnamese, he was asked if he understood his rights and he answered "yes" in English; defendant did not indicate at any time that he did not understand the questions; and a review of the written transcript of the statement itself indicates that defendant was able to respond logically and appropriately to the questions presented to him in English.

     **Am Jur 2d, Criminal Law § 797; Evidence §§ 555-557, 614.**

2. **Evidence and Witnesses § 1113 (NCI4th)— murder— Montagnard defendant—statements made through interpreter—officer's testimony**

     The trial court did not err in a noncapital murder prosecution by admitting a detective's testimony concerning statements

STATE v. MLO

[335 N.C. 353 (1994)]

made on defendant's behalf by his interpreter where this was not a situation in which the defendant and the questioning officer found each other to be unintelligible; the transcript shows that, for the most part, both defendant and Detective Roseman communicated in English; the only portion of Roseman's testimony that concerned statements elicited with the assistance of the interpreter was the portion concerning the circumstances surrounding the theft of defendant's automobile and the victim's attitude toward defendant's girlfriend; in both cases defendant and Detective Roseman were able to continue the interview in English after the interpreter briefly clarified the subject matter of the questions for defendant; this case did not involve the agency issues discussed in *State v. Felton*, 330 N.C. 619; and, assuming that it did, defendant has not made a sufficient showing to rebut the presumption of agency that arises when an accused accepts the benefit of the proffered translation to make a voluntary statement.

**Am Jur 2d, Evidence §§ 597 et seq.; Homicide §§ 337 et seq.**

3. **Evidence and Witnesses § 2850 (NCI4th) — murder — statements made by defendant — officer's use of transcript of recording to refresh recollection — no error**

The trial court did not err in a murder prosecution by allowing a detective to use the written transcription of defendant's tape recorded statements to refresh his recollection of statements made by defendant. There was no indication that the detective was not able to rely primarily on his own memory of events in giving his testimony.

**Am Jur 2d, Witnesses § 456.**

4. **Evidence and Witnesses § 2859 (NCI4th) — murder — defendant's statements — officer's use of transcript of recording to refresh recollection — recording not introduced — no error**

The trial court did not err in a noncapital first-degree murder prosecution by denying defendant's request to review the tape recording of his statement or by allowing a detective to testify as to statements contained therein without first introducing the recording into evidence. The detective used the transcript of the recorded statement to refresh his personal recollection of defendant's responses to the questions asked;

the best evidence rule does not apply to a document that serves only to refresh a witness' memory and is not offered into evidence. N.C.G.S. § 8C-1, Rule 1002.

**Am Jur 2d, Witnesses § 462.**

5. **Homicide § 256 (NCI4th) — first-degree murder — premeditation and deliberation — evidence sufficient**

The trial court did not err in a noncapital first-degree murder prosecution by denying defendant's motion to dismiss where the evidence presented in the present case clearly supports the inference that the crime was committed in a premeditated and deliberated manner in that the mattress in the victim's bedroom had bullet holes in it; slugs and shell casings matching those found in the vicinity of the corpse were found in the bedroom; there were bloodstains on the screen door of the apartment; this evidence indicates that the killing was done in the apartment and that quite likely the victim was in his bed, perhaps asleep when the first shots were fired; the victim sustained thirty-three bullet wounds all over his body; some of the entry wounds were in the victim's back, suggesting that he was trying to escape as he was being shot; the victim's body was found near Raleigh, more than one hundred miles away from the likely scene of the killing; near the body were garbage bags that contained expended shell casings fired from the same weapon that was used in the Charlotte apartment; personal effects and clothing of the victim were found in the vicinity; and it thus appears that the perpetrator, upon completion of his crime, attempted to conceal his activities by collecting and disposing of the evidence in a remote spot far from the scene of the killing.

**Am Jur 2d, Homicide §§ 437 et seq.**

6. **Homicide § 226 (NCI4th) — first-degree murder — evidence of defendant's identity — sufficient**

There was substantial evidence to support the inference that defendant was the perpetrator of a first-degree murder where the evidence showed that the victim and defendant were roommates; when defendant's girlfriend visited their apartment shortly after the time of the victim's death, defendant offered inconsistent accounts of the victim's whereabouts; the killing was shown to have taken place about the time that

STATE v. MLO

[335 N.C. 353 (1994)]

defendant was normally at work, but was not; the victim's body was found far from defendant's home, but in a location with which defendant would have been familiar, having worked nearby in prior years; defendant drove the victim's car and was in possession of the victim's watch after the crime; there was evidence that the victim had never previously allowed even his closest friend to drive his car; defendant stated that he had been in exclusive possession of the vehicle during the time period of the killing and blood samples matching the victim's own were found in the trunk of the car; defendant was shown to have owned a weapon of a make and caliber consistent with the weapon that inflicted the victim's wounds; and there was evidence of some hostility between defendant and the victim concerning defendant's relationship with Mary Ann Mirelez.

**Am Jur 2d, Homicide § 435.**

7. **Searches and Seizures § 150 (NCI4th) — first-degree murder — victim's car — released from custody — no denial of due process**

There was no violation of a first-degree murder defendant's due process rights where a detective had the victim's automobile towed to the law enforcement center after noticing what appeared to be bloodstains on the bumper and within the trunk of the automobile; defendant's counsel requested the results of a comparison of the car's tire treads to casts made at the location where the victim's body was found; no such comparison had been made; the vehicle had been released from custody; and the tires had been changed. The rules concerning the safekeeping of potential evidence were violated; however, the investigating officers at the site where the body was found did not make plaster casts of all the tracks found at that location, so that the absence of a match would have been only marginally exculpatory. Defendant did not allege or demonstrate bad faith by the police in the release of the automobile and the exculpatory value of any tests defendant wished to perform was speculative at best.

**Am Jur 2d, Searches and Seizures § 212.**

8. **Evidence and Witnesses § 1700 (NCI4th) — first-degree murder — autopsy photographs of victim — admissible**

The trial court did not err in a first-degree murder prosecution by admitting two autopsy photographs of the victim

**STATE v. MLO**

[335 N.C. 353 (1994)]

where the photographs were used to show the nature and extent of the wounds sustained by the victim; they were relevant to show not only the cause of death, but also as a means of proving the premeditation and deliberation elements of first-degree murder; there is no indication that the jury was subjected to unnecessary or excessive descriptions of the victim's injuries; and the context in which the photographs were introduced does not suggest that the purpose was to inflame the passions of the jury.

**Am Jur 2d, Evidence § 791.**

9. **Evidence and Witnesses § 216 (NCI4th)— murder—prior possession of rifle—murder weapon not identified—relevant**

There was no error in a murder prosecution in the admission of testimony that defendant had been seen in possession of a black rifle with a clip on the bottom and "a long handle that pulled back" where no murder weapon was produced at trial, but a federal firearms form was introduced which showed that an individual who identified himself as defendant purchased a .22-caliber semiautomatic rifle with a fifteen-round clip and retracting stock, and the pathologist indicated that the victim's wounds had been caused by a .22-caliber weapon. When no weapon is found in a defendant's possession at the time of his arrest or thereafter, testimony that defendant had once owned or possessed a weapon becomes especially relevant.

**Am Jur 2d, Evidence § 272.**

10. **Evidence and Witnesses § 216 (NCI4th)— murder—testimony that defendant possessed rifle—relevant**

There was no error in a murder prosecution where a witness testified that he had attempted to fire a gun owned by defendant which used small bullets during the time he had been defendant's roommate. The murder weapon was not produced at trial but the pathologist testified that the victim's wounds had been caused by a .22-caliber weapon.

**Am Jur 2d, Evidence § 272.**

11. **Evidence and Witnesses § 221 (NCI4th)— murder—subsequent possession of victim's property—relevant**

There was no error in a first-degree murder prosecution in the introduction of testimony that the witness had never

**STATE v. MLO**

[335 N.C. 353 (1994)]

seen defendant drive the victim's car prior to the day he was arrested, had not known the victim to loan his car to anyone, and had never known defendant to own a watch where the defendant was driving the victim's car and had the victim's watch in his pocket when he was questioned. Testimony concerning defendant's sudden and unprecedented possession of the victim's personal property immediately after the victim's murder is relevant to the issue of whether defendant was involved in the killing; however, assuming error under the balancing test of N.C.G.S. § 8C-1, Rule 403, defendant did not show a reasonable possibility that a different result would have been reached at trial had the error not occurred.

**Am Jur 2d, Evidence §§ 278 et seq.**

12. **Searches and Seizures § 4 (NCI4th)— murder — search of victim's automobile in defendant's possession — no expectation of privacy**

There was no error in a first-degree murder prosecution from the introduction of evidence seized from the victim's automobile where defendant was in possession of the automobile when it was seized. A person's right to be free from unreasonable searches and seizures is a personal right; the record tends to show that defendant did not have any authority to use the car and defendant's self-serving comments wherein he claimed permission to use the car are not sufficient to meet his burden of showing a legitimate possessory interest in the automobile. Furthermore, it cannot fairly be said that defendant conferred upon himself any reasonable expectation of privacy by driving the car.

**Am Jur 2d, Searches and Seizures § 32.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Fulton, J., at the 24 August 1992 Criminal Session of Superior Court, Mecklenburg County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 15 October 1993.

*Michael F. Easley, Attorney General, by Jane R. Garvey, Assistant Attorney General, for the State.*

*Isabel Scott Day, Public Defender, by Julie Ramseur Lewis, Assistant Public Defender, for defendant-appellant.*

STATE v. MLO

[335 N.C. 353 (1994)]

MEYER, Justice.

On 23 March 1992, a Mecklenburg County grand jury indicted defendant for the murder of Yhue Kbuor. Defendant was tried noncapitally in the Superior Court, Mecklenburg County, in August 1992 and was found guilty. Judge Shirley L. Fulton thereafter imposed the mandatory life sentence.

The evidence presented by the State at trial tended to show the following: On Thursday, 14 November 1991, a body later identified as that of Yhue Kbuor was found by a state wildlife officer in a pond located in a wooded area off Reedy Creek Road in Wake County. There were no dwellings in the area, and the pond was approximately five to six miles from where defendant once worked as a laborer. The body had been wrapped in a blanket that had become snagged on a tree root and was only partially submerged. Drag marks led down a steep embankment to the body.

The victim had sustained gunshot wounds all over his body. During the autopsy, a total of thirty-three wounds were discovered, although some may have been multiple wounds from a single bullet passing through the body. One wound to the upper abdomen passed upward into the heart and lung. A second wound extended from underneath the chin into the face and brain. The pathologist testified that these two wounds were the only wounds that caused significant internal injury. Eleven projectiles, which appeared to be .22-caliber bullets, were recovered from the body.

A search of the area in which the body was found disclosed several garbage bags roughly one hundred feet from the body. These bags contained various items, including documents that included what was later discovered to be the victim's name and his Charlotte, North Carolina, address. The bags also contained bloody clothing and nineteen expended .22-caliber shell casings. There were several sets of tire tracks in the area. Tire casts were made of some tracks but not all of them.

Members of the Wake County Sheriff's Department contacted and met with members of the Charlotte Police Department on Friday, 15 November 1991. Together they went to the address listed on a bank deposit slip found near the body. They took with them a Polaroid photograph of the deceased victim. The address listed, 2900 #3 Seymour Drive, was a duplex located in North Charlotte. After knocking on the door and getting no answer, the

officers knocked on the door of a neighbor. A woman answered and identified the photograph as that of Yhue Kbuor and indicated that he lived in apartment #3. When the officers attempted once again to get an answer at apartment #3, Detective Roseman of the Charlotte Police Department noticed what appeared to be a bloodstain on the lower part of the screen door. At that point, he requested that a uniformed officer secure the premises while he returned to the law enforcement center to obtain a warrant to enter the apartment. Prior to their return, an Oriental man drove a beige-colored Oldsmobile into the driveway and attempted to gain access to the apartment. The officer stationed there told the individual that he could not go inside the apartment, and the individual got back into the car and drove away.

Upon returning with a warrant, law enforcement officers conducted a search of the apartment. A mattress in the left rear bedroom of the apartment had bullet holes in it, and two spent .22-caliber projectiles were found: one inside the mattress and one in the bottom drawer of a dresser in the bedroom. One live round was found under the bed, and spent shell casings were found under the bed and near the bathroom doorway. Later analysis revealed that the shell casings found in Wake County and the shell casings found in the apartment were from the same manufacturer and had been fired by the same weapon.

At approximately 2:00 a.m. on Saturday, 16 November 1991, Detective Roseman received a call from the Charlotte Police Department duty officer informing him that defendant, who at this time was a "possible suspect," was at his place of employment and was driving the victim's car, a beige Oldsmobile. Upon arrival at defendant's place of employment, Lida Manufacturing Company, Detective Roseman located the victim's car. An exterior inspection revealed red spots, which appeared to be blood, on the bumper. Roseman knocked on the door of the business and asked to speak to defendant. When defendant appeared, Detective Roseman conducted a "pat search" of defendant and removed from defendant's pocket what was later learned to be the victim's watch. Upon questioning, defendant stated that he was driving the victim's car because the victim was sick. At the car, Roseman asked defendant if he knew anything about the stain on the bumper, and defendant initially denied knowing anything about it. Later, defendant stated that it came from some meat that the victim had purchased and placed in the trunk of the car.

Detective Roseman then looked in the trunk of the car and noticed what appeared to be blood on a plastic oil container. Roseman then closed the trunk, and the car was towed to the law enforcement center where a more thorough search was conducted. The search produced several samples of human blood collected from the trunk of the car. Some samples were too small or had deteriorated too badly for detailed examination, but stains from the spare tire cover panel and the trunk carpet were consistent with the victim's blood type. There were no inconsistent samples.

After inspecting the trunk of the car, Roseman asked defendant to accompany him to the law enforcement center to answer questions. Because Roseman anticipated potential language difficulties, an interpreter was summoned. At this time, Roseman believed that defendant spoke Vietnamese, but it was later learned that defendant, a native of the Montagnard region of Vietnam, spoke Dega as well as some English and Vietnamese.

During the interview, defendant appeared to understand what was being asked of him and for the most part responded in English without assistance from the interpreter.

During this interview, defendant completed a waiver of rights form. He stated that he was living with the victim at 2900 #3 Seymour Drive and that the victim had loaned him his automobile because he (the victim) was sick. Defendant stated that he had been in exclusive possession of the automobile since the time the victim loaned it to him. He indicated that the victim did not like defendant's girlfriend and that the victim had told him that if he continued to bring her to the apartment, defendant would have to move.

Defendant admitted once owning a rifle that he had purchased from a gun shop but stated that the rifle had been lost when his car was stolen the previous September. No police report concerning the theft of the rifle had been filed.

Records from the Hyatt Gun Shop in Charlotte indicated that defendant had purchased a .22-caliber automatic rifle from there in May 1991.

The victim's best friend in America, Yjuen Eban, testified that he had helped the victim purchase the automobile in question, a 1984 Oldsmobile. The victim had provided the purchase money, but Eban had registered the car and insured it in his own name

because the victim did not have a driver's license. This witness lived with the victim for some six months after the car was purchased and testified that he had never known the victim to loan the car to anyone. This witness also testified that although he had known defendant for many years, he had never known him to wear a watch. He further testified that a watch found in defendant's possession on 16 November 1991 had belonged to the victim.

During testimony given by the controller for Lida Manufacturing, defendant's time card was introduced into evidence. This time card showed that during the week of the killing, defendant reported to work only one time—late Friday evening just a few hours before he was first contacted by Detective Roseman.

Defendant's girlfriend, Mary Ann Mirelez, testified that defendant had come to see her in her motel room the evening of Thursday, 14 November 1991, the same day the body was discovered in Wake County. Defendant was driving the victim's car. He asked her to accompany him to another motel and she did. Defendant then left Mirelez at this motel, stating that he needed to go pick up his paycheck. Defendant returned after midnight. Defendant and Mirelez then went to defendant's home. Mirelez testified that the door to the victim's bedroom was closed and that defendant gave her varying accounts of the victim's whereabouts, saying first that he was sick and later that he had gone out of town. After staying at this location for a short time, defendant dropped Mirelez off back at her motel room and departed. He returned later that day around noon, again driving the victim's car. He and Mirelez drove to a laundromat to wash clothes; defendant cashed his check at a bank and again dropped Mirelez off at her motel.

Defendant returned again at around 3:00 p.m., still driving the victim's car. He then told Mirelez that the police were at his apartment.

Mirelez also testified that defendant had once shown her a gun. The description of the gun by Mirelez matched the general description given by the salesperson from the Hyatt Gun Shop.

Another witness, Kpoh Cilbiet, testified that he had lived with defendant after defendant moved to Charlotte from Raleigh. Cilbiet stated that defendant had owned a rifle and had hidden it when Cilbiet tried to fire it.

Additional facts will be presented as necessary for the proper disposition of the issues raised by defendant.

[1] In his first assignment of error, defendant contends that the trial court improperly denied his motion to suppress the statement given by him on 16 November 1991. Defendant asserts as grounds for this error that the statement was given without his knowingly, understandingly, and intelligently waiving his constitutional rights.

When a person is in the custody of a law enforcement officer,

the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07 (1966). Defendant was given his *Miranda* warnings, and he initialed a waiver of rights form which indicated that he understood his rights and was willing to answer questions without a lawyer present. However,

the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly given. The fact that the technical procedural requirements of *Miranda* are demonstrated by the prosecution is not, standing alone, controlling on the question of whether a confession was voluntarily and understandingly made. The answer to this question can be found only from a consideration of all circumstances surrounding the statement.

*State v. Rook*, 304 N.C. 201, 216, 283 S.E.2d 732, 742 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982). Defendant argues that he did not voluntarily and understandingly give his statement because he did not fully understand English.

The evidence showed that defendant had only a third-grade education in Vietnam, and there was no evidence that he had had any formal training in English or that he was required to speak it at his job. Additionally, although an interpreter was provided who was fluent in both Vietnamese and English, the defendant's native language was Dega, the language of the Montagnard region

of Vietnam. Defendant asserted these grounds as the basis for his allegation that he did not understand English well enough to waive his rights effectively.

When a defendant makes a motion to suppress, N.C.G.S. § 15A-977(f) requires the trial court to make findings of fact and conclusions of law. The trial court must determine whether the State has borne its burden by showing by a preponderance of the evidence that the defendant's statement was voluntary, but, on appeal, the findings of the trial court are conclusive and binding if supported by competent evidence. *State v. James*, 321 N.C. 676, 365 S.E.2d 579 (1988).

The trial judge made the following findings of fact:

14. The defendant is a Daga [sic] (Montaguard) [sic] of the central Highlands of Vietnam, whose native language is Daga, not Vietnamese; he was 28 years old at the time, came to the United States in 1986, and completed the third grade in his native country with there being no evidence of any further formal education.

15. The interpreter, not being fluent in the Daga language, conversed with the defendant in English and in Vietnamese. Officer Roseman then, in English, advised the defendant of his constitutional rights, reading them from the form which was admitted as State's Voir Dire Exhibit #2. After each right was read, Officer Roseman asked the defendant if he understood that right, whereupon the interpreter would repeat in Vietnamese what Officer Roseman said in English to the defendant. After each right the defendant replied "yes" in Vietnamese and again "yes" in English. Additionally, at Officer Roseman's request, the defendant placed his initials by each right in the spaces provided on Exhibit 2 and signed the rights form upon the form's completion after Officer Roseman asked if he were willing to waive these rights and answer questions without first consulting with a lawyer.

16. In addition to the foregoing, with regard to questions (2) and (6) on Exhibit #2, and after being asked if he understood and what they meant, the defendant replied in English that he did and read them out loud in English.

17. At no time did the defendant indicate a desire to stop answering questions, request to speak with a lawyer,

make any indication to Officer Roseman or the interpreter that he was having difficulty understanding his constitutional rights, or that he had difficulty understanding or speaking English.

18. In the opinion of both Officer Roseman and the interpreter, both while being advised of his constitutional rights and during the entire interview that followed, the defendant appeared to understand the conversation and made logical, coherent and responsive answers to the questions propounded.

19. During his testimony at this hearing, the defendant answered a number of questions in English without first having them interpreted into Daga.

20. The defendant waived his constitutional rights as set out in Exhibit 2 at approximately 6:25 a.m. on November 16, 1991 and immediately thereafter participated in the tape recorded interview that is a subject of this hearing, which interview was concluded at approximately 7:27 a.m.

A review of the pretrial motion hearing transcript reveals the following: When the statement was given, defendant had not been placed under arrest, nor had he been handcuffed, shackled, or restrained in any way. When the waiver of rights form was read to defendant both in English and in Vietnamese, he was asked if he understood his rights. Defendant answered "yes" in English. At no time did defendant indicate that he did not understand the questions. A review of the written transcript of the statement itself indicates that defendant was able to respond logically and appropriately to the questions presented to him in English. Accordingly, we hold that the findings of fact made by the trial judge are supported by competent evidence and, as such, are conclusive. *State v. Barfield*, 298 N.C. 306, 339, 259 S.E.2d 510, 535 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

Nevertheless, the conclusions of law drawn from the facts found are not binding on the appellate court and "are fully reviewable on appeal." *State v. Mahaley*, 332 N.C. 583, 593, 423 S.E.2d 58, 64 (1992); *see also Rook*, 304 N.C. at 216, 283 S.E.2d at 742. The focus of our inquiry is whether the conclusion, that defendant's waiver of rights and subsequent statement were given knowingly and voluntarily, is supported by the findings. Again, such an inquiry

requires the Court to examine "all circumstances surrounding the statement." *Rook,* 304 N.C. at 216, 283 S.E.2d at 742.

The record gives no indication that defendant was threatened, coerced, or harassed. Defendant had been in the United States for six years and was able to participate in the interview using English. On those occasions when the interpreter assisted defendant, he was able to continue the interview in English, giving logical responses to the questions asked. When Detective Roseman asked defendant if he understood instructions (2) and (6) on the waiver of rights form, defendant replied that he did and read them aloud in English. There is nothing in the record to indicate anything more than occasional communication difficulties between defendant and Detective Roseman. We hold that the trial court's determination that defendant waived his rights knowingly, intelligently, and voluntarily was correct in light of the findings; thus, this assignment of error is overruled.

[2] Defendant next contends that it was error for the trial court to admit Detective Roseman's testimony concerning statements made on defendant's behalf by his interpreter. Defendant bases his argument on our recent decision in *State v. Felton,* 330 N.C. 619, 412 S.E.2d 344 (1992), in which we held that a law enforcement officer's

> testimony regarding defendant's responses during interrogation, as translated to him by the duly qualified interpreter, was proper because it fell within the exception to the hearsay rule for admissions of a party opponent made through defendant's agent, the interpreter.

*Id.* at 637, 412 S.E.2d at 355. Defendant argues that the interpreter in this case was not qualified to serve as his agent, as she spoke Vietnamese and defendant's principal language was Dega. Thus, defendant argues, no agency relationship existed, and it was therefore error for Detective Roseman to testify concerning the interpreter's statements. We disagree.

An examination of the transcript of the interview leads us to the conclusion that it is not necessary to determine the existence of an agency relationship between defendant and his interpreter. This is not a situation where the defendant and the questioning officer found each other to be unintelligible. Rather, the transcript shows that, for the most part, both defendant and Detective Roseman

communicated in English. Detective Roseman testified that "[a]ll the questions that I asked he responded [to] in English."

The only portion of Roseman's testimony that concerned statements elicited with the assistance of the interpreter was that concerning the circumstances surrounding the theft of the victim's automobile and the victim's attitude toward defendant's girlfriend. In both cases, after the interpreter briefly clarified the subject matter of the questions for defendant, defendant and Detective Roseman were able to continue the interview in English.

We thus hold that this case does not involve the agency issues discussed in *Felton*. Even assuming *arguendo* that it does, defendant has not made a sufficient showing to rebut "the presumption of agency that arises when an accused accepts the benefit of the proffered translation to make a voluntary statement." *Felton*, 330 N.C. at 636, 412 S.E.2d at 355. Defendant's contention on this issue is without merit.

[3] Defendant next contends that it was error for the trial court to allow Detective Roseman to use the written transcription of defendant's tape-recorded statements to refresh his recollection of the statements made by defendant. This assignment of error is likewise without merit.

"It is generally accepted that two types of aid are available for a witness: *past recollection recorded* and *present recollection refreshed*." *State v. Smith*, 291 N.C. 505, 516, 231 S.E.2d 663, 670 (1977). " 'Under present recollection refreshed[,] the witness' memory is refreshed or jogged through the employment of a writing, diagram, smell or even touch,' and he testifies from his memory so refreshed." *State v. Gibson*, 333 N.C. 29, 50, 424 S.E.2d 95, 107 (1992) (quoting *State v. Corn*, 307 N.C. 79, 83, 296 S.E.2d 261, 264 (1982) ), *overruled on other grounds by State v. Lynch*, 334 N.C. 402, 432 S.E.2d 349 (1993). The evidence presented at trial comes from the witness' memory, not from the aid upon which the witness relies; thus, there is no need to engage in the foundational inquiry required under the doctrine of past recollection recorded. *See id.* at 50, 424 S.E.2d at 107. It is only " '[w]here the testimony of the witness purports to be from refreshed memory but is *clearly* a mere recitation of the refreshing memorandum[ ] [that] such testimony is not admissible as present recollection refreshed and should be excluded by the trial judge.' " *Id.* (quoting *State v. Smith*, 291 N.C. at 516, 231 S.E.2d at 670-71). There being no indication in the record that

Detective Roseman was not able to rely primarily upon his own memory of events in the giving of his testimony, we hold that the use of the transcript to refresh his recollection was not error.

[4] In his· next assignment of error, defendant contends that the trial judge erred in denying defendant's request to review the tape recording of his statement and erred in allowing Detective Roseman to testify as to defendant's statements contained therein without first introducing the tape recording into evidence.

With regard to his request that the trial judge review the tape recording, defendant argues that had the trial judge done so, she would have concluded that the tape recording was the "best evidence" of defendant's statements. We disagree.

Under the "best evidence" rule as codified in the North Carolina Rules of Evidence, when the contents of a writing are to be proved, the original writing is required. N.C.G.S. § 8C-1, Rule 1002 (1992).

Here, Detective Roseman was not attempting to prove the contents of the tape recording or the transcript of the recorded statement given by defendant. Rather, Detective Roseman used the transcript of the recorded statement to refresh his personal recollection of defendant's responses to the questions asked. The "best evidence" rule does not apply to a document that serves only to refresh a witness' memory and is not offered into evidence. See State v. Fox, 277 N.C. 1, 175 S.E.2d 561 (1970); State v. Cobbins, 66 N.C. App. 616, 311 S.E.2d 653 (1984). Defendant's assignment of error on this issue is overruled.

[5] In defendant's next assignment of error, he contends that the trial court erred in denying his motion to dismiss the charge of murder on the grounds that the evidence presented by the State was insufficient to demonstrate the elements of the crime charged. Once again, defendant's argument has no merit.

When the trial judge rules on a motion to dismiss:

"The evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable

to the State is to be considered by the court in ruling on the motion."

*State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61 (1991) (quoting *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980) ). "When a defendant moves for dismissal, the trial court is to determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense. If so, the motion to dismiss is properly denied." *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651-52 (1982).

N.C.G.S. § 14-7 "[separates] first degree murder into four distinct classes as determined by the proof." *State v. Strickland*, 307 N.C. 274, 282, 298 S.E.2d 645, 651 (1983), *modified on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). One such class is "[m]urder perpetrated by any . . . kind of willful, deliberate and premeditated killing." *Id.* Defendant was charged with first-degree murder based on premeditation and deliberation. "Premeditation means the perpetrator thought out the act beforehand for some period of time, however short, but no particular amount of time is necessary." *State v. Olson*, 330 N.C. 557, 564, 411 S.E.2d 592, 595 (1992) (citing *State v. Hamlet*, 312 N.C. 162, 169, 321 S.E.2d 837, 842 (1984) ). "Deliberation means the perpetrator carried out an intent to kill in a cool state of blood and not under the influence of a violent passion or sufficient legal provocation." *Id.*

Premeditation and deliberation are mental processes which are ordinarily not susceptible to proof by direct evidence. In a majority of cases, they must be proved by circumstantial evidence. Some of the circumstances from which premeditation and deliberation may be implied are (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*Id.* at 565, 411 S.E.2d at 596 (citing *State v. Gladden*, 315 N.C. 398, 430-31, 340 S.E.2d 673, 693 (1986) ).

STATE v. MLO

[335 N.C. 353 (1994)]

The evidence presented in the present case clearly supports the inference that the crime was committed in a premeditated and deliberated manner. The mattress in the victim's bedroom had bullet holes in it. Slugs and shell casings matching those found in the vicinity of the corpse were found in the bedroom. There were bloodstains on the screen door of the apartment. This evidence indicates that the killing was done in the apartment and that quite likely the victim was in his bed, perhaps asleep when the first shots were fired. The victim sustained thirty-three bullet wounds all over his body. Some of the entry wounds were in the victim's back, suggesting that he was trying to escape as he was being shot. These circumstances clearly support an inference that this was not a killing that occurred in a moment of uncontrollable passion.

The victim's body was found near Raleigh, more than one hundred miles away from the likely scene of the killing. Near the body were garbage bags that contained expended shell casings fired from the same weapon that was used in the Charlotte apartment. Personal effects and clothing of the victim were found in the vicinity. It thus appears that the perpetrator, upon completion of his crime, attempted to conceal his activities by collecting and disposing of the evidence in a remote spot far from the scene of the killing. We hold that there was substantial evidence to support the inference that the killing was done in a premeditated and deliberated manner.

[6]   Defendant in the present case argues that while the evidence raises a suspicion of his guilt, the State failed to present evidence that he was the perpetrator of the crime. Again, defendant's argument is without merit. The evidence showed that the victim and defendant were roommates. When defendant's girlfriend visited their apartment shortly after the time of the victim's death, defendant offered inconsistent accounts of the victim's whereabouts. The killing was shown to have taken place about the time that defendant was normally at work, but was not. The victim's body was found far from defendant's home, but in a location with which defendant would have been familiar, having worked nearby in prior years. Defendant drove the victim's car and was in possession of the victim's watch after the crime. There was evidence that the victim had never previously allowed even his closest friend to drive his car. Defendant stated that he had been in exclusive possession of the vehicle during the time period of the killing, and blood samples matching the victim's own were found in the trunk of

the car. Defendant was shown to have owned a weapon of a make and caliber consistent with the weapon that inflicted the victim's wounds. There was evidence of some hostility between defendant and the victim concerning defendant's relationship with Mary Ann Mirelez.

We conclude that there was substantial evidence to support the inference that defendant was the perpetrator of this premeditated and deliberated killing and that defendant's assignment of error on this issue is without merit.

[7] Defendant next contends that because the Charlotte Police Department improperly relinquished its custody of the victim's automobile, the case against him must be dismissed.

The vehicle first became the subject of investigation during the early morning hours of 16 November 1991. It was at this time that Detective Roseman first encountered defendant at his place of employment. Upon noticing what appeared to be bloodstains on the bumper and within the trunk of the automobile, Detective Roseman had the car towed to the law enforcement center.

When defendant's counsel stated that she needed the results of a comparison of the car's tire treads to plaster casts of vehicle tracks made at the location in Wake County where the victim's body was found, she was informed that no such comparison had been made. She was also informed that the vehicle had been released from custody, and it was later learned that the tires on the car had been changed.

The State concedes that the rules concerning the safekeeping of potential evidence were violated in this case. N.C.G.S. § 15-11.1(a) provides as follows:

(a) If a law-enforcement officer seizes property pursuant to lawful authority, he shall safely keep the property under the direction of the court or magistrate as long as necessary to assure that the property will be produced at and may be used as evidence in any trial. Upon application by the lawful owner . . ., or upon his own determination, the district attorney may release any property seized pursuant to his lawful authority if he determines that such property is no longer useful or necessary as evidence in a criminal trial and he is presented with satisfactory evidence of ownership. If the district attorney

> refuses to release such property, the lawful owner . . . may make application to the court for return of the property.

N.C.G.S. § 15-11.1(a) (1983). In the present case, the car was released to the executor of the victim's estate without the authority of the district attorney or the court.

A violation of this section does not, however, mandate dismissal of the charges against defendant. In considering the effect, if any, of the release of this evidence, such inquiry must focus on the question of whether defendant was thereby deprived of his rights to due process under the Fourteenth Amendment to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution.

The United States Supreme Court has faced similar questions with regard to situations where a defendant was unable to obtain access to evidence. In *Brady v. Maryland*, the Supreme Court held that

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. 83, 87, 10 L. Ed. 2d 215, 218 (1963). In that case, the defendant had asked to examine statements made by his co-conspirator. One such statement, in which the co-conspirator admitted the actual homicide, was withheld from the defendant. *Id.* at 84, 10 L. Ed. 2d at 217. Based on these circumstances, the Supreme Court ruled that the withholding of that evidence violated the defendant's right to due process. *Id.* at 87, 10 L. Ed. 2d at 218.

The present case, however, is readily distinguishable from *Brady*. Here, counsel for defendant stated that had she been allowed access to the car, she would have compared the tire treads on the vehicle to the plaster casts made of tire tracks at the location where the body was discovered "and see what, if anything, we could determine." The State did not make any such comparisons; furthermore, the investigating officers at the Wake County site did not make plaster casts of all of the vehicle tracks found at that location. Thus, all that defense counsel would have been able to show if a match was not found was that, for whatever reason, no plaster casts matched the tires presently on the vehicle. Put another way,

whereas a match would have been highly incriminating, the absence of a match would have been only marginally exculpatory.

We think this case resembles *Arizona v. Youngblood*, where the defendant in a rape trial claimed that his due process rights were violated when the police failed to test or properly preserve for testing certain articles of the victim's clothing. The Supreme Court rejected this argument, stating:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

488 U.S. 51, 57, 102 L. Ed. 2d 281, 289 (1988), *reh'g denied*, 488 U.S. 1051, 102 L. Ed. 2d 1007 (1989). The Supreme Court went on to hold "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 102 L. Ed. 2d at 289.

Defendant in this case has not alleged or demonstrated any bad faith on the part of the police in the release of the automobile, nor does the record reveal any such conduct. The exculpatory value of any tests defendant wished to perform on the automobile was speculative at best. Accordingly, defendant's assignment of error on this issue is without merit.

[8] In his next assignment of error, defendant contends that the trial judge erred in admitting two photographs of the victim taken during the victim's autopsy.

The photographs at issue are State's exhibits #18 and #28. Exhibit #18 depicts the head of the victim's corpse with a pathologist's probe inserted through the cheek and out of the temple, indicating the path of one of the gunshot wounds sustained by the victim. Exhibit #28 is a photograph of the victim's ankle showing the entrance and exit of another gunshot wound.

Defendant did not object to the admission of these photographs into evidence but contends on appeal that "the photographs at issue here lacked any probative value whatsoever and were inflammatory, their erroneous admission was a fundamental error, so prejudicial, so lacking in its elements that it denied defendant a fair trial."

In order for photographic evidence to be admitted, it must first meet the relevancy requirements of Rule 401 of the North Carolina Rules of Evidence, that is, the photograph must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992).

In this case, the photographs were used to show the nature and extent of the wounds sustained by the victim. The photographs were relevant to show not only the cause of death, *State v. Williams*, 308 N.C. 47, 301 S.E.2d 335, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983), but also, because they showed numerous gunshot wounds, were relevant as a means of proving the premeditation and deliberation elements of first-degree murder, *State v. Olson*, 330 N.C. 557, 585, 411 S.E.2d 592, 596; *see State v. Gladden*, 315 N.C. 398, 340 S.E.2d 673.

After the photographs have been shown to be relevant, they are still subject to exclusion under Rule 403 if their "probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (1992). In ruling on the admissibility of photographic evidence, the trial judge must engage in what is known as a balancing test pursuant to Rule 403. "In general, the exclusion of evidence under the balancing test of Rule 403 of the North Carolina Rules of Evidence is within the trial court's sound discretion." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988). It is only "where the trial court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision" that the trial judge's ruling will be overturned on appeal. *Id.*

Although no definitive test for the admissibility of photographs alleged to be inflammatory and unduly prejudicial has been developed, factors that courts have looked to in the past include: (1) the number of the photographs, *State v. Sledge*, 297 N.C. 227,

231-32, 254 S.E.2d 579, 582 (1979); (2) whether the photographs were unnecessarily duplicative of other testimony, *State v. Mercer*, 275 N.C. 108, 120, 165 S.E.2d 328, 337 (1969), *overruled on other grounds by State v. Caddell*, 287 N.C. 266, 215 S.E.2d 348 (1975); (3) whether the purpose of the photographs was aimed solely at arousing the passions of the jury, *State v. Murphy*, 321 N.C. 738, 741, 365 S.E.2d 615, 617 (1988); and (4) the circumstances surrounding the presentation of the photographs, *State v. Hennis*, 323 N.C. 279, 286, 372 S.E.2d 523, 528.

The two photographs in the present case were admitted to show the wounds sustained by the victim. There is no indication in the record that the jury was subjected to unnecessary or excessive descriptions of the injuries to the victim. The photographs were taken in a clinical setting and are not particularly gruesome given the circumstances of the crime. The context in which they were introduced does not suggest that their purpose was to inflame the passions of the jury. The forensic pathologist, Dr. John D. Butts, merely gave a brief description of what the photographs contained as foundation for their admission into evidence. The photographs were subsequently distributed to the jury by hand. We find no error in the admission of the photographs.[1]

Defendant's next three assignments of error concern the admission of testimony given by three different witnesses. Defendant questions the relevance of the testimony of each and contends that even if the testimony has some relevance, it should have been excluded pursuant to Rule 403 because, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403. Such a determination is within the discretion of the trial judge, and his ruling will not be overturned unless the "ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Shoemaker*, 334 N.C. 252, 261, 432 S.E.2d 314, 318 (1993).

[9] In the first of these assignments of error, defendant contends that the trial court erred in allowing Mary Ann Mirelez to testify that she had seen defendant in possession of a black rifle with

---

1. In an apparent typographical error, the question presented in defendant's brief lists State's exhibit #26 as one of the offending photographs. We have examined exhibit #26 and, in accordance with the reasoning stated for exhibits #18 and #28, find no error in its admission.

a clip on the bottom and, as she described it, "a long handle that pulled back." Defendant argues that because no murder weapon was produced at trial and because there was no evidence showing a link between the rifle seen by Mirelez and the weapon used to kill Mr. Kbuor, such evidence was irrelevant and highly prejudicial.

When no weapon is found in a defendant's possession at the time of his arrest or thereafter, testimony that defendant had once owned or possessed a weapon becomes especially relevant. By its nature, such evidence is circumstantial, but circumstantial evidence is proper and sufficient to prove facts at issue in a trial. *State v. Arsad,* 269 N.C. 184, 152 S.E.2d 99 (1967); *State v. Hamilton,* 264 N.C. 277, 141 S.E.2d 506 (1965), *cert. denied,* 384 U.S. 1020, 16 L. Ed. 2d 1044 (1966); *State v. Alston,* 233 N.C. 341, 64 S.E.2d 3 (1951).

Defendant contends that because there was no link between the rifle described by Mirelez and the weapon that killed Mr. Kbuor, the testimony was highly prejudicial and should have been excluded. Defendant overlooks the testimony of William S. Wasserman, a salesman for the Hyatt Gun Shop in Charlotte. During Mr. Wasserman's testimony, a federal form entitled a "Firearms Transaction Record" was introduced into evidence. This form indicated that an individual who identified himself as Ysut Mlo purchased a .22-caliber semiautomatic rifle with a fifteen-round clip and retracting stock. The pathologist clearly indicated that the victim's wounds had been caused by a .22-caliber weapon.

The testimony of Mary Ann Mirelez was used to prove that defendant had owned a weapon that could have been used to kill the victim. We hold that such testimony is relevant and that the trial court did not commit error in the admission of the testimony. Defendant's assignment of error is without merit.

[10] Defendant raises a similar assignment of error with regard to the testimony of witness Kpoh Cilbiet. Cilbiet testified that during the time that he and defendant were roommates, he attempted to fire a gun owned by defendant, and that the gun had small bullets. Again, defendant contends that this testimony was irrelevant and unfairly prejudicial. We hold, in accordance with the reasoning stated above, that such testimony is relevant and admissible, and defendant's assignment of error on this point is likewise without merit.

STATE v. MLO

[335 N.C. 353 (1994)]

[11] Defendant's next assignment of error concerns the testimony of witness Yjuen Eban. Eban testified that he had never seen defendant drive the victim's car prior to the day he was arrested nor had he known the victim to loan his car to anyone including himself, even though he and Kbuor had lived together for six months. Again, defendant contends that this testimony was irrelevant or that whatever probative value the statements had was substantially outweighed by the danger of unfair prejudice. Defendant says the same with regard to Eban's testimony that he had never known defendant to own a watch, and the watch found in defendant's pocket at the time he was initially questioned belonged to the victim.

Testimony concerning defendant's sudden and unprecedented possession of the victim's personal property immediately after the victim's murder is relevant to the issue of whether defendant was involved in the killing. Assuming *arguendo*, however, that it was error to allow the testimony under the balancing test of Rule 403, defendant bears the burden of showing that had the error not occurred, there is a reasonable possibility that a different result would have been reached at trial. N.C.G.S. § 15A-1443(a) (1988). Defendant has presented nothing to persuade this Court that this is the case nor does a reading of the transcript indicate that this might be so. As defendant has not borne this burden, he is not entitled to a new trial based on this assignment of error.

[12] In his final assignment of error, defendant contends that the trial court erred in denying his motion to suppress the evidence seized from the victim's automobile, including the results of the tests performed on the evidence. Defendant argues that the search and seizure of the vehicle and the evidence it contained violated his Fourth Amendment right to be free from unreasonable searches and seizures.

Before defendant can assert the protection afforded by the Fourth Amendment, however, he must demonstrate that any rights alleged to have been violated were his rights, not someone else's. A person's right to be free from unreasonable searches and seizures is a personal right, and only those persons whose rights have been infringed may assert the protection of the Fourth Amendment. *State v. Monk*, 291 N.C. 37, 229 S.E.2d 163 (1976); *State v. Gordon*, 287 N.C. 118, 213 S.E.2d 708 (1975), *judgment vacated in part*, 428 U.S. 903, 49 L. Ed. 2d 1207 (1976); *State v. Craddock*, 272 N.C. 160, 158 S.E.2d 25 (1967).

STATE v. MLO

[335 N.C. 353 (1994)]

"It is a general rule of law in this jurisdiction that one may not object to a search or seizure of the premises or property of another." *State v. Greenwood*, 301 N.C. 705, 707, 273 S.E.2d 438, 440 (1981) (citing *State v. Eppley*, 282 N.C. 249, 192 S.E.2d 441 (1972); *State v. Ray*, 274 N.C. 556, 164 S.E.2d 457 (1968); *State v. Craddock*, 272 N.C. 160, 158 S.E.2d 25). The basis for this rule is the requirement that the individual relying on immunity from unreasonable searches and seizures have a " 'reasonable expectation of freedom from governmental intrusion' " in the place or property searched. *State v. Alford*, 298 N.C. 465, 471, 259 S.E.2d 242, 246 (1979) (quoting *Mancusi v. DeForte*, 392 U.S. 364, 20 L. Ed. 2d 1154 (1968)); *see also Katz v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576 (1967).

> [T]he lack of property rights in an invaded area is not necessarily determinative of whether an individual's Fourth Amendment rights have been infringed. Nonetheless, there are many instances in which the presence or absence of property rights in an invaded area are the best determinants of an individual's reasonable expectations of privacy.

*Alford*, 298 N.C. at 471, 259 S.E.2d at 246 (citations omitted). The burden of showing this ownership or possessory interest is on the person who claims that his rights have been infringed. *Greenwood*, 301 N.C. at 708, 273 S.E.2d at 441; *see also State v. Taylor*, 298 N.C. 405, 259 S.E.2d 502 (1979).

In the present case, the vehicle that was searched belonged to the victim. The only indication of any right to possession by the defendant was his unsubstantiated assertion in his initial statement that the victim had loaned the car to him because the victim was "sick." The record tends to show that defendant did not have any authority to use the car. Defendant did not present any evidence at trial that showed he had permission to use the car. Although defendant was not charged with the theft of the automobile, the evidence indicates that he was using the automobile without the deceased owner's permission. Defendant's self-serving comments wherein he claimed permission to use the car are not sufficient to meet his burden of showing a legitimate possessory interest in the automobile. Furthermore, it cannot fairly be said that by driving the car, defendant conferred upon himself any reasonable expectation of privacy with regard to the vehicle. *See Greenwood*, 301 N.C. at 709, 273 S.E.2d at 441 ("No thief has any reasonable

expectations of privacy in his use of the property he has stolen."). Defendant does not, therefore, have standing to assert a privilege against the search and seizure of the vehicle. Defendant's assignment of error on this point is therefore without merit.

We conclude that defendant received a fair trial free from prejudicial error and that the judgment appealed from must be upheld.

NO ERROR.