STATE OF NORTH CAROLINA v. WANDA COLEEN WILSON

No. 2A94

(Filed 28 July 1995)

### 1. Criminal Law § 1599 (NCI4th)— restitution of funeral expenses—insufficiency of evidence to support

The procedure for recommending restitution as a condition of work release or parole is: (1) the trial court must determine if it is going to recommend restitution; (2) the amount of restitution must be supported by the evidence adduced at trial or sentencing; and (3) the determination of defendant's ability to pay will be made either by the Department of Correction or by the Parole Commission at the time restitution is actually ordered. In this case, the trial court did not err in failing to find defendant's ability to pay, but did err in ordering restitution of funeral expenses of $4,000 based only on the prosecutor's unsworn testimony that these expenses were $4,000. N.C.G.S. § 15A-1343(d).

**Am Jur 2d, Pardon and Parole § 80.**

### 2. Evidence and Witnesses § 1275 (NCI4th)— inculpatory statement made to police—defendant's capacity unaffected by alcohol

The trial court did not err in denying defendant's motion to suppress an inculpatory statement defendant gave to police while she was in custody on the ground she lacked the capacity to knowingly and voluntarily waive her rights, since defendant gave appropriate and responsive answers to officers' questions about defendant's age, date of birth, and place of residence, among other things; defendant could walk and climb stairs unassisted; defendant stated to the officer that she had consumed alcohol but was unimpaired by it; and, in the officer's opinion, defendant was

not impaired to the extent that she did not understand what she was saying and what he was asking her.

**Am Jur 2d, Evidence § 747.**

## 3. Homicide § 245 (NCI4th)— first-degree murder—sufficiency of evidence

The evidence of specific intent to kill after premeditation and deliberation was sufficient to be submitted to the jury in a first-degree murder prosecution where it tended to show that the victim did not provoke defendant but instead remained in his car during the entire events leading up to his murder and did not have any contact with defendant until she came over to his car with a knife; when defendant approached the car, the victim did not attempt to get out of the car or confront defendant; prior to the killing, defendant threatened to kill the victim's companion and then to kill the victim; after the murder defendant made statements to the effect that she intended to kill the victim; after defendant stabbed the victim, she touched the wound and stated that she had done it; defendant did not attempt to help the victim but instead threw away the murder weapon and went inside her apartment; and as defendant was escorted out of her apartment by police officers, she admitted to surrounding witnesses that she was the one who had stabbed the victim.

**Am Jur 2d, Homicide § 439.**

## 4. Appeal and Error § 155 (NCI4th)— absence of instruction—failure to preserve for appellate review

Defendant failed to preserve for appellate review under N.C. R. App. P. 10(b)(2) an assignment of error to the trial court's failure to instruct on the lack of mental capacity as it related to defendant's ability to form a specific intent to commit murder where defendant failed to timely object to the trial court's instructions. Defendant also waived appellate review under N.C. R. App. P. 10(c)(4) by failing specifically and distinctly to contend that the error amounts to plain error.

**Am Jur 2d, Trial § 395.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of life imprisonment entered by Stanback, J., at the 26 July 1993 Mixed Session of Superior Court, Alamance County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 13 January 1995.

STATE v. WILSON

[340 N.C. 720 (1995)]

*Michael F. Easley, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Charlesena Elliott Walker, Assistant Appellate Defender, for defendant-appellant.*

ORR, Justice.

Defendant was tried noncapitally at the 26 July 1993 Mixed Session of Superior Court, Alamance County, for first-degree murder and assault with a deadly weapon with intent to kill. On 30 July 1993, a jury returned a verdict finding defendant guilty of first-degree murder and not guilty of assault with a deadly weapon with intent to kill. The trial court imposed a mandatory sentence of life imprisonment for the first-degree murder conviction and dismissed the charge of assault with a deadly weapon with intent to kill.

On appeal, defendant brings forward five assignments of error. After a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we conclude that as to the conviction for first-degree murder, defendant received a fair trial, free from prejudicial error. As to the amount of restitution for funeral expenses recommended by the trial court, however, we conclude that the amount was not supported by the evidence. Therefore, for the reasons stated below, we affirm defendant's conviction for first-degree murder and sentence of life imprisonment and vacate that portion of the judgment recommending restitution for funeral expenses in the amount of $4,000.

This case arises out of the murder of Aaron Rudd, who was stabbed while sitting in his car outside of defendant's apartment waiting for his friends. The following is a summary of the events leading up to the murder and the circumstances surrounding the murder as presented by the State: The night of 29 August 1992, Aaron Rudd drove Charles King ("Ciggie"), Dontae Jackson, and John Mark Baker to defendant's apartment to talk with defendant's sister, Lovely, and her friends. Ciggie got out of the car and went into the apartment while Aaron, Dontae, and John remained in the car.

In defendant's apartment, a fight took place between defendant's boyfriend, Tracey Teague, and Ciggie. Ciggie testified that while he was fighting with Tracey, he heard a noise from the kitchen that sounded like silver objects "clinging together." Dontae testified that

he ran into defendant's apartment to get Ciggie and heard "rustling" of silverware from the kitchen. Dontae testified that he saw defendant come out of the kitchen with two knives, one in each hand, and that defendant started swinging these knives at Ciggie. Dontae and Ciggie left defendant's apartment immediately.

Aaron, Dontae, John, Ciggie, and an individual named Mikey later returned to defendant's apartment in two cars to talk with one of Lovely's friends. While Aaron remained in his parked car, Dontae and Ciggie got out of the cars and met Tracey walking down the sidewalk. A fight ensued between Dontae and Tracey. Ciggie and Dontae both testified that while Tracey and Dontae were fighting, defendant came out of her apartment with a knife and began swinging the knife at Dontae. Dontae jumped back, and defendant missed him, whereupon Dontae ran to Aaron's car.

Dontae testified that as he was running to Aaron's car, defendant was chasing him, swinging the knife and saying, "I'm gonna kill you, mother f———, I'm gonna kill you." Dontae testified that he jumped into Aaron's car on the passenger side, closed his door, and rolled up his window. At this time, Aaron was still sitting in the driver's seat of his car, and his door was open. Dontae testified that Aaron closed his door but that his window was still down. After Dontae rolled up his window, defendant went over to Aaron's side of the car, cursing and yelling at Dontae. Defendant looked at Aaron, and Aaron stated that he had nothing "to do with it" and asked defendant why she was yelling at him. Dontae testified that defendant looked at him and then looked at Aaron and stated, "If I can't get you, I'm gonna get him" and stabbed Aaron. Dontae heard Aaron say, "I'm stabbed," and then Aaron turned the car into the driveway, honking the horn. Defendant walked back inside of her apartment. Aaron was taken to the hospital by ambulance, where he died shortly thereafter.

Officer Stanford of the Burlington Police Department took defendant into custody and transported her to the Burlington Police Department where Detective Greg Seel interviewed her. Detective Seel testified that he asked defendant what happened that night and she stated, "I stabbed him. I stabbed him to keep him from coming back." After changing rooms, Detective Seel explained to defendant that the matter he was investigating was serious. Detective Seel testified that he again asked defendant to relate to him the events of the night and that defendant stated

that Dontae, Ciggie, and someone else had come over to the apartment and that she and Tracey were in bed. She stated that she had asked Lovely not to have these people over there anymore and that Lovely had asked them in, and [defendant] stated that she came downstairs and asked them to leave. She stated that they all left and went outside and then [defendant] and Tracey went back upstairs to the bedroom. She said that they stayed upstairs for about fifteen minutes and then [defendant] could hear them outside arguing, so she went back downstairs and they were in the front yard. [Defendant] went outside with Tracey, and Tracey and Ciggie got into an argument and Ciggie smacked Tracey. She said that Ciggie beat Tracey up. She stated that when she came outside she had a steak knife with her that she got out of the kitchen drawer by the stove in her apartment. She stated that she was fighting with someone and that she wanted them to leave her alone and then she stated, "I meant to do it, but I didn't mean to do it." She then stated that she was fighting and that she took the knife out of the waistband of her shorts and she stabbed him in the chest. She stated that she thought he was trying to run away from me or her at the time that she stabbed him. She stated that she heard [Aaron] Rudd say, "They started it, and call the ambulance." After she stabbed Rudd, she went into her house. She stated that the knife still had blood on it and that she . . . thought that she threw the knife in the pasture behind her apartment. She stated after she threw the knife away she went upstairs and smacked Lovely. She told Lovely, "I knew that I'd done something wrong," and then she told Lovely, "See what you made me do," and then Lovely replied that she didn't [mean] to do it. She stated shortly after that her mother, Linda Bigelow, had come over to the apartment. She stated that she came downstairs and that the police and her mother were downstairs in her apartment. She stated, "Okay, I'm coming."

Officer Somers of the Burlington Police Department testified that he recovered the knife from behind defendant's apartment near a pasture, behind a tree. Officer Somers identified the knife at trial as being a Rogers steak knife with a dark wooden handle, nine inches long, with a bent tip and dark-colored stains on the blade. The knife was admitted into evidence.

Dr. Clark, a forensic pathologist, testified that on 30 August 1992, he performed an autopsy on Aaron Rudd. Dr. Clark testified that

Aaron had a stab wound on the front part of his chest and that Aaron died as a result of this stab wound.

Defendant also testified at trial. Defendant testified that on 29 August 1992, she celebrated her twenty-sixth birthday by drinking alcohol all day. Defendant began drinking malt liquor beer at 10:00 a.m. and continued throughout the day to drink beer and gin and to smoke crack cocaine. Defendant testified that around 12:30 or 1:00 a.m., after she had taken some sleeping pills and some other pills that she had stolen from her mother, she and Tracey went upstairs in her apartment, leaving her sister and her friends downstairs. Defendant testified that she went upstairs because she was "tired drunk."

Thereafter, defendant heard "a lot of noise" downstairs and told Tracey to go downstairs and tell her sister and her company that they had to leave. Defendant testified that she heard an argument and that she went downstairs and told everyone to leave her apartment. Defendant testified that at this time, Ciggie and Tracey got into a fight, that she was knocked down, and that she hit her head on the bar. Defendant testified that she did not remember anything about the rest of the night after she hit her head and that she did not remember seeing or speaking to the police. Defendant testified that the next thing she remembered after the fight between Tracey and Ciggie was being in a strange place and her mother telling her that she had killed somebody.

## I.

[1] Defendant first contends that the trial court erred in ordering that defendant pay restitution for funeral expenses in the amount of $4,000 to the victim's parents as a condition of work release or parole. In support of her contention, defendant argues that the trial court failed to give any consideration "to defendant's ability to pay and no evidence was presented to support the amount ordered" in violation of N.C.G.S. § 15A-1343(d). We disagree with defendant's assertion that the trial court was required to consider defendant's ability to pay $4,000 in restitution at the time of sentencing. We agree with defendant's assertion, however, that the $4,000 amount must be supported by evidence at trial or sentencing.

Pursuant to N.C.G.S. §§ 148-33.2(c), -57.1(c) (1994), and as stated on the written judgment and commitment, the trial court's order of restitution as a condition of work release or parole constitutes a *recommendation* to the Secretary of the Department of Correction and

the Parole Commission, not an order binding defendant to pay restitution in this amount upon entry of the judgment in this action.

> Neither the Parole Commission nor the Department of Correction is bound by the judge's recommendation of restitution as a condition of parole or work release. When the time comes that restitution may be imposed as a condition of parole, the Parole Commission must give defendant notice that restitution is being considered as a condition of parole and an opportunity to be heard. G.S. 148-57.1(d). The Department of Correction must follow this same procedure before restitution may be imposed as a condition of work release. G.S. 148-33.2(d). Such a hearing is the proper forum for determination of defendant's ability to pay restitution.

*State v. Arnette*, 67 N.C. App. 194, 196, 312 S.E.2d 547, 548 (1984) (citation omitted). Thus, "[t]here is no statutory requirement for a sentencing judge to inquire into a defendant's ability to pay restitution when the judge merely recommends restitution as a condition of parole or work release." *Id.* at 196, 312 S.E.2d at 548-49. We conclude, therefore, that the trial court did not err in failing to consider defendant's ability to pay restitution, as the potentially binding determination at a later date requiring defendant to pay restitution as a condition of work release or parole by either the Department of Correction or the Parole Commission will by necessity require sufficient evidence of defendant's ability to pay at that time.

However, the amount of restitution recommended by the trial court must be supported by evidence adduced at trial or at sentencing. *State v. Daye*, 78 N.C. App. 753, 756, 338 S.E.2d 557, 560, *disc. rev. allowed*, 316 N.C. 554, 344 S.E.2d 11, *aff'd per curiam*, 318 N.C. 502, 349 S.E.2d 576 (1986). "Even though recommendations of restitution are not binding, we see no reason to interpret the statutes of this State to allow judges to make specific recommendations that cannot be supported by the evidence before them." *Id.* at 757, 338 S.E.2d at 560. Therefore, "[r]egardless of whether restitution is ordered or recommended by the trial court, the amount must be supported by the evidence." *Id.*

Thus, the procedure for recommending restitution as a condition of work release or parole is as follows: First, the trial court must determine if it is going to recommend restitution. Second, if the trial court decides to recommend restitution in a specific amount, then this amount must be supported by the evidence adduced at trial or

sentencing. Finally, the determination of defendant's ability to pay restitution will be made by either the Department of Correction or the Parole Commission at the time restitution is actually ordered as a condition of work release or parole.

In the present case, the only evidence presented to support the amount of funeral expenses recommended by the trial court is the prosecutor's unsworn statement that these expenses were in the amount of $4,000. This evidence is insufficient to support the amount of restitution recommended. *See State v. Buchanan*, 108 N.C. App. 338, 341, 423 S.E.2d 819, 821 (1992) (unsworn statements of prosecutor insufficient to support recommended amount of restitution). Thus, because the $4,000 amount of recommended restitution is not supported by the evidence adduced at trial or sentencing, we vacate that portion of the judgment recommending restitution in the amount of $4,000.

## II.

[2] Next, defendant contends that the trial court erred in denying her motion to suppress an inculpatory statement she gave to police while she was in custody on the grounds that she lacked the capacity to "knowingly and voluntarily" waive her rights. We disagree.

When a person is in the custody of law enforcement officers,

"the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently."

*State v. Ingle*, 336 N.C. 617, 634, 445 S.E.2d 880, 888 (1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07 (1966)), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 222 (1995). Consequently,

"the ultimate test of the admissibility of a confession still remains whether the statement made by the accused was in fact voluntarily and understandingly given. The fact that the technical procedural requirements of *Miranda* are demonstrated by the prosecution is not, standing alone, controlling on the question of whether a confession was voluntarily and understandingly made.

The answer to this question can be found only from a considera-
tion of all circumstances surrounding the statement."

*State v. Mlo*, 335 N.C. 353, 363, 440 S.E.2d 98, 102 (quoting *State v.
Rook*, 304 N.C. 201, 216, 283 S.E.2d 732, 742 (1981), *cert. denied*, 455
U.S. 1038, 72 L. Ed. 2d 155 (1982)), *cert. denied*, —— U.S.——, 129
L. Ed. 2d 841 (1994).

In the present case, defendant contends that she did not volun-
tarily and knowingly give her statement because at the time of the
questioning, her mental ability to reason was impaired by depression,
shock, alcohol, sleeping pills, and cocaine. We disagree.

The trial court held a *voir dire* and made extensive findings of
fact concerning the interview in question. The trial court found that
on 30 August 1992, at approximately 4:30 a.m., Detective Seel inter-
viewed defendant at the Burlington Police Department. At the time of
this interview, defendant was under arrest and charged with murder.
The trial court found that before beginning the interview, Detective
Seel advised defendant of her *Miranda* rights, that after each right
was read to her, defendant was asked if she understood the right, and
that defendant responded that she understood all of her rights.

The trial court further found that in the presence of Detective
Seel, defendant signed a statement saying that she voluntarily waived
her rights. The trial court found that Detective Seel observed defend-
ant for an hour to an hour and a half and that during this time, he
observed defendant walking, talking, and climbing steps. The trial
court found that defendant was able to walk alone and climb steps
without aid and that Detective Seel indicated that in his opinion, "she
was not so impaired as to not understand what she was saying or
hearing what was going on."

The court also found

that the statements given by the defendant to the detective were
reasonable, that there were no promises, offers of reward, or
inducement made by the law enforcement officer to the defend-
ant to make a statement, that there were no threats or suggested
violence or show of violence by the law enforcement officer to
persuade or induce the defendant to make a statement, that there
was no indication by the defendant that she wished to stop talk-
ing, there was no request by the defendant for a lawyer, and the
defendant indicated that she understood her rights and voluntar-
ily waived her rights orally and in writing.

STATE v. WILSON

[340 N.C. 720 (1995)]

Based on these findings, the trial court concluded that the statement made by defendant was made "freely, voluntarily, and understandingly while the defendant was in full understanding of her constitutional rights, that she was not so impaired by the consumption of alcohol as not to understand her rights and understand that she was freely, voluntarily, and understandingly waiv[ing] those rights."

"The trial court's findings of fact following a *voir dire* hearing are binding on this [C]ourt when supported by competent evidence." *State v. Lane*, 334 N.C. 148, 154, 431 S.E.2d 7, 10 (1993) (citing *State v. Mahaley*, 332 N.C. 583, 592, 423 S.E.2d 58, 64 (1992), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 649 (1995)). The trial court's conclusions of law based upon its findings are, however, fully reviewable on appeal. *Id.*

In the present case, the trial court's findings were supported by the following evidence presented at *voir dire*: Prior to advising defendant of her *Miranda* rights, Detective Seel asked her if she were under the influence of any alcohol or drugs. Defendant responded that she had drunk three beers and a "plate of kiwi," a type of wine. Detective Seel then asked defendant if she felt impaired by the alcohol, and she stated "no, that she was not." Thereafter, Detective Seel read defendant her *Miranda* rights.

Detective Seel went through each right with defendant, checking them off on a form when defendant indicated that she understood them. Then Detective Seel asked defendant if she understood each of these rights, and defendant indicated that she did understand these rights by writing "yes" and her name beside the question. Detective Seel then asked defendant if, with these rights in mind, she wished to talk with him, and defendant wrote "yes" and her initials beside this question. Defendant also signed a written form that indicated that she understood her rights, that she was willing to make a statement and answer questions without a lawyer present, and that no promises or threats had been made to her and no pressure or coercion had been used against her.

Defendant accurately wrote her name and date of birth on the waiver form and accurately answered Detective Seel's questions regarding her name, age, date of birth, place of residence, lack of employment, marital status, and the number of children she had. Defendant walked down the stairs and hallway unassisted, and she appeared to Detective Seel to know where she was. Defendant's answers were appropriate and responsive, and in Detective Seel's

opinion, defendant was not impaired to the extent that she did not understand what he was saying and what he was asking her.

We find the foregoing evidence substantial evidence in support of the trial court's findings. Further, the trial court's conclusion that under these facts defendant gave her statement "freely, voluntarily, and understandingly" and that defendant was "not so impaired by the consumption of alcohol as not to understand her rights and understand that she was freely, voluntarily, and understandingly waiv[ing] those rights" was correct. *See State v. Eason*, 328 N.C. 409, 423-24, 402 S.E.2d 809, 816 (1991) (trial court properly concluded defendant was not so "hung over" as to render his statement involuntary based on the evidence that at the time he was advised of his rights, defendant did not appear to be under the influence of drugs or alcoholic beverages, defendant appeared to understand where he was, what was going on, and what was being asked, defendant was not threatened or offered inducements to respond, and defendant asked the officers what evidence they had against him before answering questions); *see also State v. McCollum*, 334 N.C. 208, 236-37, 433 S.E.2d 144, 160 (1993) (where defendant contended his mental retardation and emotional disabilities prohibited him from making a knowing and intelligent waiver of his constitutional rights, the trial court properly concluded that defendant knowingly and intelligently waived his constitutional rights and voluntarily made his statements to officers where the evidence showed defendant chose to go with the officers and appeared to have no problem understanding what the officers talked about or any of their instructions, officers read defendant each of his rights and defendant indicated he understood these rights and signed a waiver of his rights form, and defendant's answers were reasonable in relation to the questions asked by the officers), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied*, —— U.S. ——, 129 L. Ed. 2d 924 (1994). Defendant's assignment of error is overruled.

### III.

**[3]** Defendant also contends that the trial court erred in denying her motion to dismiss the charge of first-degree murder based on the insufficiency of the evidence. We disagree.

"On a motion to dismiss on the ground of insufficiency of the evidence, the question for the court is whether there is substantial evidence of each element of the crime charged and of the defendant's perpetration of such crime." *State v. Bates*, 309 N.C. 528, 533, 308 S.E.2d 258, 262 (1983).

## STATE v. WILSON

[340 N.C. 720 (1995)]

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term 'substantial evidence' simply means 'that the evidence must be existing and real, not just seeming or imaginary.' *State v. Powell*, 299 N.C. 95, 99 261 S.E.2d 114, 117 (1980)."

*State v. Watson*, 338 N.C. 168, 175-76, 449 S.E.2d 694, 699 (1994) (quoting *State v. McAvoy*, 331 N.C. 583, 589, 417 S.E.2d 489, 493 (1992)), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 569 (1995). "The trial court must consider such evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn therefrom." *State v. Patterson*, 335 N.C. 437, 450, 439 S.E.2d 578, 585 (1994).

Upon a motion to dismiss in a trial for first-degree murder, " 'the trial court must determine whether the evidence, viewed in the light most favorable to the State, is sufficient to permit a jury to make a reasonable inference and finding that the defendant, after premeditation and deliberation, formed and executed a fixed purpose to kill.' " *Id.* (quoting *State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61-62 (1991)). In the present case, defendant contends that although there was evidence of an intentional unlawful act by defendant sufficient to support an inference of malice, there was insufficient evidence to show that prior to committing the unlawful act, defendant formed the specific intent to kill the victim and committed the unlawful act in execution of that intent.

"Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Keel*, 333 N.C. 52, 58, 423 S.E.2d 458, 462 (1992) (citations omitted). " 'Premeditation is defined as thought beforehand for some length of time; deliberation means an intention to kill, executed by defendant in a "cool state of blood" in furtherance of a fixed design or to accomplish some unlawful purpose.' " *State v. Bell*, 338 N.C. 363, 388, 450 S.E.2d 710, 724 (1994) (quoting *State v. Jones*, 303 N.C. 500, 505, 279 S.E.2d 835, 838 (1981)), *petition for cert. filed,* —— U.S. ——, —— L. Ed. 2d —— (No. 94-9093-CSY, 13 April 1995). "A *specific intent to kill* is a necessary constituent of the elements of premeditation and deliberation." *State v. Young*, 324 N.C. 489, 493, 380 S.E.2d 94, 96 (1989) (citing *State v. Propst*, 274 N.C. 62, 161 S.E.2d 560 (1968)). "Proof of premeditation and deliberation is proof of that intent." *Id.*

" 'Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence.' " *Bell*, 338 N.C. at 388, 450 S.E.2d at 724 (quoting *State v. Brown*, 315 N.C. 40, 59, 337 S.E.2d 808, 822-23 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *rev'd on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988)). Circumstances and actions used to prove premeditation and deliberation include:

"(1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds."

*Mlo*, 335 N.C. at 369, 440 S.E.2d at 106 (quoting *State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992)).

In the present case, the evidence, viewed in the light most favorable to the State, showed that the victim, Aaron Rudd, did not provoke defendant. In fact, the evidence tended to show that Aaron remained in his car during the entire events leading up to his murder and did not have any contact with defendant until she came over to his car with a knife. Aaron did not go into defendant's apartment, nor was he physically involved in the fights between defendant's boyfriend and Ciggie, and defendant's boyfriend and Dontae. When defendant approached Aaron in the car, Aaron did not attempt to get out of the car or confront defendant. Instead, Aaron told defendant that he did not have anything to do with the fight between her boyfriend and Dontae and asked her why she was yelling at him.

The evidence further tended to show that prior to the killing, defendant threatened to kill Dontae and then to kill Aaron and that prior to the killing and after the killing, defendant made statements to the effect that she intended to kill Aaron. Defendant came out of her apartment with two knives, one in her hand and another in the waistband of her pants. Defendant swung one of the knives at Dontae but missed. Defendant then chased Dontae up a hill and over to Aaron's car, swinging a knife and threatening, "I'm gonna kill you, mother f——, I'm gonna kill you." When defendant got to the car, she approached Aaron's side of the car, cursing and yelling, saying,

"Mother f———, I told ya'll not to come back . . . . I don't know what ya'll came back for." Defendant looked at Aaron, and Aaron stated, "I have nothing to do with it. Why are you yelling at me?" Defendant stated that if she could not get Dontae, she would get Aaron. Defendant then reached through Aaron's window and stabbed Aaron in the chest with such force that the knife went through Aaron's sternum, through the right ventricle of his heart, through his diaphragm, and into his liver.

After she stabbed Aaron, defendant touched the wound and stated, "Yeah, that's right, I did it, I did it. I told you, mother f———, to leave Tracey alone." Defendant did not attempt to help Aaron; instead, she walked over to her apartment, discarded the knife in a wooded area, and went inside. As defendant was escorted out of her apartment by police officers, she admitted to the surrounding witnesses that she was the one who stabbed Aaron. When she arrived at the police station, defendant stated to police officers, "I stabbed him. I stabbed him to keep him from coming back."

From the foregoing, we conclude that substantial evidence existed to show defendant acted with the specific intent to kill Aaron Rudd after premeditation and deliberation. Accordingly, the trial court properly denied defendant's motion to dismiss the charge of first-degree murder based on the insufficiency of the evidence. Defendant's assignment of error is without merit.

## IV.

[4] Next, defendant contends that the trial court erred in denying her request to instruct the jury on the lack of mental capacity as it related to defendant's ability to form the specific intent to commit murder. We disagree.

During the charge conference, defense counsel stated, "There is a specific instruction for voluntary intoxication or lack of capacity for premeditation and deliberation in first degree murder" and referenced N.C.P.I.—Crim. 305.11. Defense counsel then stated, "We would ask for the voluntary intoxication as to premeditation and deliberation in the first degree murder." The trial court agreed to give an instruction on voluntary intoxication. Following the presentation of additional evidence and prior to the jury instruction being given, defense counsel stated:

[I]n asking the [c]ourt for the instruction on voluntary intoxication, that instruction as a pattern instruction would cover volun-

tary intoxication by drugs or alcohol as well as a diminished capacity or lack of mental capacity. Based upon the testimony about depression and some other things, being out of touch with reality after the situation, we're asking the [c]ourt to include the language about lack of mental capacity, and what's clear to me is we didn't specifically address that, if the [c]ourt was going to include that language in that instruction or not.

Other than statements by the prosecutor that he did not think there was evidence of lack of mental capacity and that he was unsure of the language in the instruction to which defense counsel was referring, there was no further discussion on the record regarding the charge. Thereafter, the trial court instructed the jury on voluntary intoxication but did not instruct on the lack of mental capacity. After the jury retired to the jury room, the trial court asked whether the State or defendant had any corrections or additions to the jury charge. Defense counsel responded, "No sir."

On appeal, defendant contends that the trial court erred in failing to instruct the jury on lack of mental capacity. Because defendant failed to timely object to the trial court's instruction, however, defendant did not preserve this assignment of error for appellate review under Rule 10(b)(2) of the Rules of Appellate Procedure. N.C. R. App. P. 10(b)(2) states:

*Jury Instructions; Findings and Conclusions of Judge.* A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection; provided, that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

Further, defendant does not allege plain error. N.C. R. App. P. 10(c)(4) provides:

In criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule or law without any such action, nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error.

In the present case, because defendant has failed to specifically and distinctly allege that the trial court's instruction amounted to plain

error, defendant has waived any appellate review. *State v. Hamilton*, 338 N.C. 193, 208, 449 S.E.2d 402, 411 (1994).

## V.

Finally, defendant contends that the trial court erred by allowing the prosecutor on cross-examination to improperly question and impeach defendant. Again, however, defendant failed to object to the specific questions which she now argues were in error, and she does not allege plain error. Thus, defendant has failed to preserve this assignment of error for appellate review. *State v. Johnson*, 340 N.C. 32, 455 S.E.2d 644 (1995); N.C. R. App. P. 10(b)(1), (c)(4).

As to the first-degree murder conviction and sentence of life imprisonment—NO ERROR.

As to the recommended amount for restitution for funeral expenses—VACATED.