STATE OF NORTH CAROLINA v. DEBORAH ANN CLIFTON

No. COA95-1335

(Filed 4 March 1997)

**1. Appeal and Error § 418 (NCI4th)— assignment of error— not argued—abandoned**

Assignments of error not brought forth or argued are deemed abandoned pursuant to N.C.R. App. P. 28(a).

**Am Jur 2d, Appellate Review §§ 18, 88, 89; Homicide § 560.**

**2. Evidence and Witnesses § 1767 (NCI4th)— evidence admitted—experiment—dissimilarities—actual circumstances— limited conclusions**

The trial court in a second-degree murder prosecution properly admitted the results of experiments that demonstrated that it was probable that defendant was in close proximity to the defendant's husband at the time that he was shot because of the back splatter blood stains. The state's expert witness acknowledged the dissimilarity of the experiment and the actual circumstances and clearly indicated his limited conclusions that the blood splatter on the right shoulder of the defendant's blouse was the result of the person wearing the blouse being in close proximity to a source of blood at the time it was being acted upon by a force.

**Am Jur 2d, Evidence §§ 996, 998, 1000-1004, 1012.**

**Admissibility, in criminal cases, of evidence of electrophoresis of dried evidentiary bloodstains. 66 ALR4th 588.**

**Admissibility, in criminal prosecution, of expert opinion evidence as to "blood splatter" interpretation. 9 ALR5th 369.**

**3. Evidence and Witnesses § 1757 (NCI4th)— second-degree murder—blood splatter tests—relevant—not prejudicial**

The trial court in a second-degree murder prosecution properly admitted the results of blood splatter experiments where the experiments were relevant in that they demonstrated that it was more probable that defendant was in close proximity to the vic-

tim at the time the gun was fired; furthermore, the experiments cast doubt on the credibility of defendant's statements to police that she did not remember being close to her husband at the time of the shooting and that she did not see the shooting.

**Am Jur 2d, Evidence §§ 996, 998, 1000-1004, 1012.**

**Admissibility, in criminal cases, of evidence of electrophoresis of dried evidentiary bloodstains. 66 ALR4th 588.**

**Admissibility, in criminal prosecution, of expert opinion evidence as to "blood splatter" interpretation. 9 ALR5th 369.**

4. **Homicide § 342 (NCI4th)— motion to dismiss—involuntary manslaughter—evidence sufficient**

It was not error for the trial court to deny defendant's motion to dismiss charges of involuntary manslaughter in the death of defendant's husband where the state provided evidence of defendant's statements the day of the shooting; that defendant's husband had been happy just prior to the shooting; that defendant was in close proximity to her husband with back splatter blood stains on the right shoulder of her blouse; that shortly before the shooting, defendant and her husband were arguing about a new pickup truck and pistol; that both defendant and her husband had been drinking at the time of the shooting; evidence concerning the path of the bullet and the wound itself contradicted the possibility of self-infliction; evidence that self-infliction of such a wound by the victim with the .44 caliber pistol that was thirteen inches in length with a seven and three eighths inch barrel would be physically difficult; that the pistol was found lying on the kitchen counter some 54 inches from the body of the victim while his glasses were askew on the floor near the body; that no blood was found on the pistol; that the victim's father did not hear about his son's death from his daughter-in-law; that defendant did not speak to her father-in-law for over a year prior to trial; and that both defendant and her husband were right handed.

**Am Jur 2d, Dismissal, Discontinuance, and Nonsuit §§ 62, 91, 92.**

**Propriety of manslaughter conviction in prosecution for murder, absent proof of necessary elements of manslaughter. 19 ALR4th 861.**

**5. Criminal Law § 1649 (NCI4th Rev.)— second-degree murder—funeral expenses—restitution—insufficient findings**

The trial court erred in ordering defendant to pay the victim's father $3,000 in restitution for funeral expenses where the record revealed no evidence of the cost of victim's funeral, or who paid it. A trial court's order of restitution must be supported by competent evidence in the record; restitution is not intended to punish defendants, but to compensate victims.

**Am Jur 2d, Criminal Law §§ 1052, 1055.**

**Measure and elements of restitution to which victim is entitled under state criminal statute. 15 ALR5th 391.**

**6. Criminal Law § 1214 (NCI4th Rev.)— second-degree murder—sentencing—prior offense—pardon of forgiveness— judicial notice improper**

It was improper for the trial court to take judicial notice of defendant's prior conviction for purposes of enhancing defendant's sentence where the judicial notice was of defendant's pardon of forgiveness for her 1979 conviction of accessory after the fact to robbery with a dangerous weapon. By taking judicial notice of the pardon of forgiveness and by finding that defendant's prior conviction constituted an aggravating factor, the trial court infringed upon the prerogatives of the governor. There are two types of pardons in North Carolina: A pardon of innocence, which is a full pardon; and a pardon of forgiveness, which is a conditional pardon. A conditional pardon can be revoked only by the governor and only after the governor has performed his administrative duty of evaluating any violations of the conditions of the pardon.

**Am Jur 2d, Evidence § 142; Habitual Criminals and Subsequent Offenders § 13.**

Appeal by defendant from judgment entered 30 June 1995 by Judge Robert H. Hobgood in Franklin County Superior Court. Heard in the Court of Appeals 21 October 1996.

On 12 May 1994 defendant argued with her husband, James Clifton, in their kitchen about the purchase of a new pistol and truck. Both defendant and her husband had consumed alcohol. Defendant's husband had a blood alcohol level of 0.15.

At 9:20 p.m. Youngsville Volunteer EMS Sue Etta Allen responded to a 911 emergency call made by defendant. As Allen entered their kitchen, she observed defendant sitting on the left side of James Clifton's body which lay on the kitchen floor in a pool of blood. Defendant had blood on her hands, face, and blouse. Defendant stood and ran out of the house into the yard hollering, "Help me, help me." Defendant was "frantic, hysterical, and very upset."

Another rescue worker, Justin Scott Gailey, arrived immediately after Allen. He began to assist Allen and noticed James Clifton had ceased breathing and did not have a pulse. Gailey observed a large wound in the armpit area of James Clifton's left side. The rescue workers began CPR. They continued treatment of James Clifton until an ambulance crew arrived to assist them.

At about 9:30 p.m. Chief Deputy Walter Beckham of the Franklin County Sheriff's Department arrived at defendant's residence. Chief Deputy Beckham spoke with defendant. Defendant repeatedly stated that if her husband were dead she would kill herself. Defendant also stated that if she had already left her husband this would not have happened. Chief Deputy Beckham noticed that defendant had on a shirt and pants but no shoes. Defendant told Chief Deputy Beckham that she and her husband had been arguing about a new truck and a new pistol, that her husband had shot himself, that she did not see her husband shoot himself, that she did not remember being close to her husband when he shot himself, and that her husband had put the gun in his mouth on previous occasions. With her permission, Chief Deputy Beckham wiped defendant's hands for a gunshot residue test. Chief Deputy Beckham went back into the kitchen and observed that a pistol lay on its sales receipt on the kitchen counter about six feet from the body.

At around 10:10 p.m Director Steven R. Jones of the Franklin County Sheriff's Department Bureau of Identification examined the kitchen and photographed it. He found a .44 caliber Ruger Super Redhawk double-action revolver lying on the counter on a sales paper, next to an open, nearly full bottle of beer. The pistol was thirteen inches in length with a seven and three eights inch barrel. The pistol's butt was fifty four inches from the corner of the stove, beneath which James Clifton had fallen. He also found, behind the stove island and on the kitchen counter, a pair of eyeglasses face down on the floor, a lead bullet core some two and a half inches from the glasses, and a copper jacket from a bullet. Jones observed blood

and tissue spattering on the kitchen counters and refrigerator. A portion of the bullet had struck the refrigerator. Director Jones looked for a suicide note, but did not find one. He collected the bloody clothes defendant had worn so they could be tested.

James Clifton's father heard about his son's death from a deputy. On the morning following his son's death, he telephoned defendant. Defendant told him she did not know what happened and then handed the phone to her friend with whom she had stayed all night. Defendant did not talk to Mr. Clifton again at any time before the trial.

On 18 April Special Agent Jed Taub of the serology section of the SBI conducted tests and determined that there was no blood on the gun retrieved from the kitchen. In his expert opinion, he determined that the force of the bullet of the type that struck James Clifton may, on penetration, caused a fine mist of blood, known as back splatter, to spray back in the direction from which the shot came. He observed that the bullet upon exit from the body would produce considerably more and larger drops of blood travelling in the same direction as the bullet, known as forward splatter. The back splatter would generally not travel more than 10 to 18 inches.

On 17 May 1994 SBI Special Agent Eugene Bishop tested the .44 caliber Ruger pistol recovered from the scene, found that it was in good working order, and determined that the fragmented bullet that killed James Clifton came from it.

Associate Chief Medical Examiner Karen E. Chancellor performed an autopsy on James Clifton. The autopsy revealed that a single large bullet entered James Clifton's body under his left arm in the armpit area and partially exited near the midline of his upper back. The entry wound was surrounded by powder residue and powder stippling from a gun. This indicated that upon the firing of the gun the barrel of the weapon was in close proximity to the body. Dr. Chancellor observed dense powder stippling on the upper inside of James Clifton's arm, near the elbow, and to a lesser degree on his left forearm. Dr. Chancellor determined that James Clifton died as a result of extensive bleeding caused by a gunshot.

SBI Agent David McDougall conducted experiments to produce blood splatter patterns on white poster board and on a white undershirt. Agent McDougall obtained the patterns from his experiments by firing both a .22 caliber pistol and the .44 caliber Ruger into a

blood-soaked sponge, and by slapping a blood source by hand. He compared the results of his experiment to defendant's blood soaked blouse. He found the fine droplets of blood covering the upper right shoulder and back of the blouse were a distinct misting-type stain consistent with the back splatter pattern he produced on the undershirt. While he concluded that this indicated defendant was in close proximity to James Clifton at the time the gun was fired, he also found that these results were not helpful in determining who was holding the gun at the time of the shooting.

By true bill of indictment returned 23 May 1994 defendant was charged with first degree murder of James Clifton. On 26 June 1995 defendant was arraigned upon a charge of second degree murder. Upon a plea of not guilty, on 30 June 1995 the jury found defendant guilty of involuntary manslaughter. The trial judge took judicial notice of defendant's pardon of forgiveness and considered it for purposes of sentencing. Upon finding that aggravating factors outweighed mitigating factors, the trial judge sentenced defendant to ten years imprisonment and recommended work release when eligible. As a condition of work release, defendant was ordered to pay restitution in the amount of $3,000.00 to James Clifton's father for funeral expenses. Defendant appeals from this judgment imposing sentence and ordering her to pay restitution.

*Attorney General Michael F. Easley, by Assistant Attorney General John A. Greenlee, for the State.*

*Mark A. Perry for defendant-appellant.*

EAGLES, Judge.

[1] Defendant fails to bring forward or argue assignments of error 4, 6, 7, 8, 9, 10, 11 and 12 in her brief. These assignments of error are deemed abandoned pursuant to N.C.R. App. P. 28(a).

[2] We first consider whether the trial court erred by allowing evidence of results of blood splatter experiments conducted by the State's witness over defendant's objection on the grounds that the experiments were not conducted under substantially similar circumstances to those prevailing at the time of the shooting and that the experiment was not relevant.

In order for experimental evidence to be admissible it must be relevant and the experiment must be conducted under circumstances substantially similar to those prevailing at the time of the occurrence

STATE v. CLIFTON

[125 N.C. App. 471 (1997)]

in controversy. *State v. Phillips*, 228 N.C. 595, 598, 46 S.E.2d 720 (1948); *State v. Wright*, 52 N.C. App. 166, 173-74, 278 S.E.2d 579, 585, *disc. review denied*, 303 N.C. 319, 281 S.E.2d 658 (1981). The requirement of substantial similarity does not require precise reproduction of circumstances to be admissible. *Id.* The trial court must consider whether there are dissimilarities in conditions likely to distort the results of the experiment, and whether the dissimilarities may be adjusted or explained so that their effects can be understood by the jury. *State v. Jones*, 287 N.C. 84, 97-98, 214 S.E.2d 24, 33-34 (1975); *Wright*, 52 N.C. App. at 174, 278 S.E.2d at 585. If the differences in the conditions are explainable by the expert witness, precise reproduction of the circumstances is not required. *Id.* Candid acknowledgement of dissimilarities and limitations of the experiment are enough to insulate the testimony from prejudice great enough to warrant reversal. *Wiles v. N.C. Farm Bureau Insurance Co.*, 85 N.C. App. 162, 165-66, 354 S.E.2d 248, 250, *disc. review denied*, 320 N.C. 517, 358 S.E.2d 533 (1987). Whether an experiment was conducted under substantially similar conditions is a question of law and is reviewable by the appellate courts. *Wright*, 52 N.C. App. at 173, 278 S.E.2d at 585 (*citing State v. Jones*, 287 N.C. 84, 214 S.E.2d 24 (1975)).

The experiments were conducted by firing .22 caliber and .44 caliber revolvers through blood soaked sponges and by slapping a blood source by hand. White paper and a tee shirt were placed in close proximity to the sources of blood to record the blood spray patterns. The State's expert testified that these methods of experimentation were standard procedure conducted by his agency, that the results obtained were indicative of or similar to blood patterns observed in other actual shootings, and that the results seen in the experiment were consistent with the stains actually found on defendant's blouse in evidence.

While there were differences between the circumstances of the experiments and of the shooting, the expert witness acknowledged the dissimilarity of the sponge used in the experiments from human flesh and that his experiments could not identify who held the weapon at the moment of firing. He also stated that variables of caliber, muzzle velocity, and other factors could influence the result. He clearly communicated his limited conclusion: "Based on the blood stain analysis detailed in this report, the blood splatter on the right shoulder of the [defendant's blouse] is the result of the person wearing the [blouse] being in close proximity to a source of blood at the time it was being acted upon by a force."

**[3]** Defendant also argues that the experiments were not relevant pursuant to N.C. Rule Evid. 401 which provides, "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, the experiments demonstrated that it was more probable that defendant was in close proximity to James Clifton at the time the gun was fired because of the back splatter blood stains on the right shoulder of her blouse. Furthermore, the experiments cast doubt on the credibility of defendant's statements to Chief Deputy Beckham that she did not remember being close to her husband at the time of the shooting and that she did not see the shooting. Accordingly, we conclude that the trial court properly admitted the results of the experiments.

**[4]** The second issue is whether the trial court committed reversible error by denying defendant's motion to dismiss for insufficiency of the evidence.

The test for sufficiency of the evidence to support a conviction in a criminal case is whether there is substantial evidence of all elements of the offense charged that would allow any rational trier of fact to find beyond a reasonable doubt that defendant committed the offense. *State v. Richardson*, 342 N.C. 772, 785, 467 S.E.2d 685, 692, *cert. denied*, —— U.S. ——, 136 L.Ed.2d 160 (1996). Substantial evidence is that relevant evidence which a reasonable mind would accept as sufficient to support a conclusion. *State v. Patterson*, 335 N.C. 437, 449, 439 S.E.2d 578, 585 (1994). "The law will not allow a conviction on evidence that merely gives rise to a suspicion or a conjecture that defendant committed a crime." *State v. Lambert*, 341 N.C. 36, 42, 460 S.E.2d 123, 127 (1995). On sufficiency of evidence review, the evidence "must be viewed in a light most favorable to the State, and the State is to receive any reasonable inference that can be drawn from the evidence." *State v. Hardy*, 339 N.C. 207, 236, 451 S.E.2d 600, 617 (1994).

Involuntary manslaughter is the "unintentional killing of a human being without malice proximately caused by a culpably negligent act or omission." *State v. McKoy*, 122 N.C. App. 482, 485, 470 S.E.2d 542, 544, *disc. review denied*, 343 N.C. 755, 473 S.E.2d 622 (1996). Culpable negligence means any act or omission which evidences a disregard for human rights and safety. *State v. Burton*, 119 N.C. App. 625, 633, 460 S.E.2d 181, 188 (1995). The act or omission must be so

STATE v. CLIFTON

[125 N.C. App. 471 (1997)]

careless or reckless that it "imports a thoughtless disregard of the consequences of the act or the act shows a heedless indifference to the rights and safety of others." *State v. Meadlock*, 95 N.C. App. 146, 149, 381 S.E.2d 805, 806, *disc. review denied*, 325 N.C. 434, 384 S.E.2d 544 (1989).

The jury confronted a single question in reaching their verdict of guilty of involuntary manslaughter: Did defendant pull the trigger of the gun that killed James Clifton? The State presented the following evidence that assisted the jury in answering the question in the affirmative: Defendant's statements the day of the shooting; evidence that James Clifton had been happy just prior to the shooting; evidence that defendant was in close proximity to James Clifton with back splatter blood stains on the right shoulder of her blouse; evidence that shortly before the shooting, defendant and James Clifton were arguing about a new pickup truck and pistol; evidence that both defendant and James Clifton had been drinking at the time of the shooting; evidence concerning the path of the bullet and the wound itself, in the left armpit, coursing slightly down and through the body, coupled with the strong powder residue and stippling present on James Clifton's inside upper arm and left forearm, contradicted the possibility of self-infliction; evidence that self-infliction of such a wound by the victim with the .44 caliber pistol that was thirteen inches in length with a seven and three eighths inch barrel would be physically difficult; evidence that the pistol was found lying on the kitchen counter some 54 inches from the body of James Clifton while the victim's glasses were askew on the floor near the body; evidence that no blood was found on the pistol; evidence that James Clifton's father did not hear about his son's death from his daughter-in-law; evidence that defendant did not speak to her father-in-law for over a year prior to trial; and evidence that both defendant and James Clifton were right handed. We conclude that the trial court correctly determined that there is sufficient evidence to justify submission of the case to the jury. Accordingly, the trial court did not err in denying defendant's motion to dismiss.

[5] The third issue is whether the trial court erred in ordering defendant to pay $3,000.00 in restitution for funeral expenses to the father of James Clifton where defendant failed to object to the order of restitution and where there was nothing in the record to support a finding that any amount of restitution was due or to whom it might be payable.

Generally, in order to preserve a question for appellate review a party must have presented the trial court with a timely objection or motion, stating the specific grounds for the ruling the party desired the court to make. N.C.R. App. P. 10(b)(1); *see State v. Reid,* 322 N.C. 309, 312, 367 S.E.2d 672, 674 (1988). Immediately after the trial court sentenced defendant and ordered her to pay restitution, the court asked defendant if there was anything further for the court. At that time defendant renewed her motion to dismiss. At no time prior to the court's order to pay restitution did the prosecution request restitution or present evidence supporting an order of restitution. Therefore, it appears that defendant had little if any opportunity to object specifically to the order to pay restitution. Despite defendant's failure to object, we review this order in our discretion pursuant to N.C.R. App. P. 2.

A trial court's award of restitution must be supported by competent evidence in the record. *State v. Wilson,* 340 N.C. 720, 459 S.E.2d 192 (1995); *State v. Buchanan,* 108 N.C. App. 338, 341, 423 S.E.2d 819, 821 (1992); *State v. Daye,* 78 N.C. App. 753, 756, 338 S.E.2d 557, 560, *affirmed,* 318 N.C. 502, 349 S.E.2d 576 (1986). In *Daye* this Court stated that to justify an order to pay restitution, "there must be something more than a guess or conjecture as to an appropriate amount of restitution. Restitution is not intended to punish defendants, but to compensate victims. There is no predetermined fine or presumption of damages." 78 N.C. App. at 757-58, 338 S.E.2d at 561 (1986). After careful review of the record we find no evidence of the cost of James Clifton's funeral or who paid for it. Accordingly, we conclude that the trial court erred in ordering payment of restitution.

[6] The final issue is whether the trial court erred in finding as an aggravating factor that defendant had a prior conviction punishable by more than sixty days and therefore improperly sentenced the defendant to a maximum term of ten years.

The weighing of factors in aggravation and mitigation is within the sound discretion of the sentencing court, and will not be disturbed upon appeal absent a showing of an abuse of discretion. *State v. Abee,* 60 N.C. App. 99, 298 S.E.2d 184 (1982), *aff'd and modified on other grounds,* 308 N.C. 379, 302 S.E.2d 230 (1983). G.S. 15A-1340.4(e) (1988) provides in pertinent part that prior convictions "may be proved by stipulation of the parties or by the original or a certified copy of the court record of the prior conviction." The permissible methods of proof of prior convictions in G.S. 15A-1340.4(e) are per-

missive, not mandatory or exclusive. *State v. Brewer,* 89 N.C. App. 431, 436, 366 S.E.2d 580, 583, *cert. denied,* 322 N.C. 482, 370 S.E.2d 229 (1988). Here the trial court noted that North Carolina Rules of Evidence provide that evidence of a conviction is not admissible if the conviction has been pardoned; however, during a sentencing proceeding the rules of evidence are suspended. N.C.R. Evid. 609, 1101(b)(3). Here, the trial court took judicial notice of defendant's pardon of forgiveness for her 1979 conviction of accessory after the fact to robbery with a dangerous weapon and considered her 1979 conviction an aggravating factor during sentencing.

No decisions in North Carolina have specifically addressed whether a trial court during sentencing may consider a pardoned offense as an aggravating factor.

This issue raises a potential conflict between the executive and judicial functions under the North Carolina Constitution. The North Carolina Constitution provides the governor with the exclusive prerogative to issue pardons. N.C. CONST. art. III, § 5(6); *see State v. Lewis,* 226 N.C. 249, 37 S.E.2d 691 (1946). Here the trial court took judicial notice of defendant's pardon as proof of a prior conviction in order to impose additional punishment for defendant's crime of involuntary manslaughter. In short, the issues we face are: Is the court impinging on the governor's executive power to pardon by increasing defendant's sentence for a present offense based on a prior pardoned offense and may the court properly use the governor's pardon of a prior conviction as proof of that prior conviction? There is a conflict of authority on these issues in other jurisdictions. *See* G. Van Ingen, Annotation, *Pardon as Affecting Consideration of Earlier Conviction in Applying Habitual Criminal Statute,* 31 A.L.R.2d 1181 (1953).

A number of courts have held a pardoned conviction cannot be used as a basis for increasing the punishment of a second subsequent offender. 31 A.L.R.2d at 1189; *see Havens v. State,* 429 N.E.2d 618 (Ind. Sup. Ct. 1981); *Guastello v. Dept. of Liquor Control,* 536 S.W.2d 21 (Mo. Sup. Ct. 1976); *Fields v. State,* 85 So.2d 609 (Fla. Div. A 1956); *Kelly v. State,* 185 N.E. 453 (Ind. Sup. Ct. 1933); *State v. Childers,* 2 So.2d 189 (La. Sup. Ct. 1941); *State v. Lee,* 132 So. 219 (La. Sup. Ct. 1931); *State v. Martin,* 52 N.E. 188 (Ohio Sup. Ct. 1898); *Edwards v. Commonwealth,* 78 Va. 39 (1883). Courts following this view have reasoned that the additional punishment imposed on a subsequent offense is not done because there is a subsequent offense alone, but

as a consequence of the prior offense; therefore, because the prior offense was blotted out and its consequences removed by the full pardon, the pardoned prior conviction cannot be considered. *Edwards*, 78 Va. at 49 (1883). Also, at least one court has reasoned that because some states have expressly included pardoned offenses among those that may be considered for purposes of their habitual criminal act, and because their legislature had not, the court had to construe their legislature intended that pardoned offenses not be considered under their habitual felon statute. *Kelly*, 185 N.E. 453 (Ind. Sup. Ct. 1933).

Other states, which constitute a majority, hold that the pardon of a conviction does not preclude the underlying conviction from being considered as a prior offense under a statute increasing the punishment for a subsequent offense. *Id.*; *see State v. Cobb*, 403 N.W.2d 329 (Minn. Ct. App. 1987); *State v. Wiggins*, 360 S.W.2d 716 (Mo. Sup. Ct. 1962); *Murry v. Hand*, 356 P.2d 814 (Kan. Sup. Ct. 1961); *Shankle v. Woodruff*, 324 P. 2d 1017 (N.M. Sup. Ct. 1958); *Dean v. Skeen*, 70 S.E.2d 256 (W. Va. Sup. Ct. 1952); *People ex rel. Prisament v. Brophy*, 287 N.E.2d 468 (N.Y. Sup. Ct. 1941); *State v. Stern*, 297 N.W. 321, 322-23 (Minn. Sup. Ct. 1941); *People v. Biggs*, 71 P.2d 214 (Cal. Sup. Ct. 1937); *United States v. Salas*, 387 F.2d 121, 122 (2d Cir. 1967); *Groseclose v. Plummer*, 106 F.2d 311, 314 (9th Cir. 1939). One reason stated for this view is that "increased punishment decreed by the statute for any offender who commits a second error is not, however, further punishment for the prior offense. 'The punishment is for the new crime only, but is the heavier if he is an habitual criminal.' " *Brophy*, 287 N.E.2d at 469-70 (quoting *McDonald v. Commonwealth of Massachusetts*, 180 U.S. 311, 312, 45 L. Ed. 542 (1901)); *Carlesi v. People of State of New York*, 233 U.S. 51, 58, 58 L. Ed. 843 (1914); *see United States v. Salas*, 387 F.2d 121, 122 (2nd Cir. 1967). Another reason supporting this view is that the "ambit of the pardons statute must be confined to a restoration of civil rights; it cannot have the effect of eliminating consideration of a prior conviction in a subsequent judicial proceeding." 403 N.W.2d at 330. This logic raises serious concerns over the separation of powers of the judiciary and the executive branches of government.

In North Carolina a governor may issue two types of pardons: A pardon of innocence, a full pardon; and a pardon of forgiveness, a conditional pardon. Although N.C. CONST. art. III, § 5(6) provides the governor with the exclusive prerogative to issue pardons, G.S. 147-24 (1993) requires the governor to examine violations of a conditional pardon and to revoke the conditional pardon once the governor has

determined that the conditions of the pardon have been violated. *See State v. Lewis*, 226 N.C. 249, 37 S.E.2d 691 (1946). A conditional pardon can be revoked only by the governor and only after the governor has performed his administrative duty of evaluating any violation of the conditions of the pardon. Here by taking judicial notice of the pardon of forgiveness and by finding that defendant's prior conviction constituted an aggravating factor, the trial court infringed upon the prerogatives of the governor. The reasoning that an increased punishment for the present offense due to a prior pardoned conviction is not punishment for the prior pardoned offense is a legal fiction that conflicts with logic and the administrative duties of the governor.

We hold that a pardoned prior conviction may not be considered as an aggravating factor during sentencing absent revocation of the pardon by the governor. Accordingly, we conclude that the trial court erred in taking judicial notice of defendant's prior conviction for purposes of enhancing the sentence.

No error in trial; remanded for resentencing.

Judges MARTIN, John C., and SMITH concur.